Paul BROSTE, Plaintiff and Appellant,

v.

FARMERS UNION CO-OPERATIVE ELEVATOR COMPANY of Parshall, North Dakota and F. W. Ahlgren, Defendants and Respondents.

No. 7450.

Supreme Court of North Dakota.

June 6, 1955.

Waldron & Kenner, Minot, for appellant.

E. J. McIlraith, Minot, and Gary L. Lerberg, Parshall, for respondents.

SATHRE, Judge.

The original complaint alleges that on or about July 27, 1950, the plaintiff agreed to sell to the defendants 3550 bushels of wheat at $2.20 per bushel, and that the wheat was to be delivered within thirty days; that the defendants refused to accept delivery of the wheat within said time or at any time; that meanwhile the market went down and the plaintiff was compelled to sell his wheat at a substantial loss, for which he demanded damages from the defendants.

The defendants answered by general denial, and specifically denied that they agreed to buy said wheat.

At the opening of the trial the plaintiff moved to amend his complaint by adding thereto an allegation that in May 1952 the defendants acknowledged their obligation to the plaintiff and that a compromise settlement was entered into by which the defendants agreed to pay to the plaintiff the sum of $852.00 and that the plaintiff agreed to accept the same in full settlement of his claim.

The defendants answered by general denial specifically denying that any compromise settlement was ever agreed upon and demanded judgment for dismissal of plaintiff's cause of action. The plaintiff was required to make an election upon which cause of action he desired to proceed, and he elected to stand on the cause of action alleged in his amended complaint.

The case was tried in the district court of Mountrail County before the court and a jury.

The defendant F. W. Ahlgren, manager of the elevator of the defendant was called for cross-examination under the statute and he testified in substance as follows:

He was manager of the elevator of the defendant Farmers Union Cooperative Elevator Co. at the time of the alleged sale claimed to have been made by the plaintiff; that on or about July 27, 1950 the plaintiff came to the elevator and stated that he had a bin of wheat of between 3000 and 4000 bushels that he would like to sell and deliver before harvest and inquired what the market price was and how much he would be allowed for the protein content; that he advised plaintiff that if he bought the wheat he would want delivery before harvest; that he had no empty space at that time; that the market price at that time was $2.18 and an additional two cents would be allowed for protein content. He stated that he did not agree to buy the wheat, and that in all cases where wheat was purchased for future delivery a written notation was made thereof and it was the general practice to hedge against all such purchases; that no written notation or memoranda was ever made of a sale by the plaintiff.

Rodney Tompers an employee of the defendant elevator company, testifying for the defendants stated he did not hear the conversation between plaintiff and Ahlgren on July 27, but that the plaintiff came to the elevator the following day and made inquiry about the market; that Tompers told him the market was down a few cents; that he then asked the plaintiff:

"Paul, why don't you contract your wheat? and Paul said 'I contracted it yesterday'. So I walked over to the files that we have there and where we have the record of the contracts that are made. I looked up there for the paper, and when I did not find Paul Broste's name, so then I asked him: 'Paul, are you sure that you made a contract; and he said yes, and I said Paul, I don't see your name on this, so I think you probably better see Freddie (Ahlgren) and that was our conversation that day.' "

Lester Lorvig, a contractor who happened to be in the elevator office on July 27, 1950

when the plaintiff and Ahlgren were there, stated that he heard the plaintiff inquire about the market and that he had a bin of between 3000 and 4000 bushels of wheat that he would like to move before harvest, but that he heard nothing about a contract of sale.

The plaintiff Paul Broste, testifying in his own behalf stated that he came to defendant's elevator July 27, 1950; that he talked with the manager Ahlgren and told him that he had a bin of between 3000 and 4000 bushels of wheat he would like to sell before harvest so as to make room for the new crop. He inquired about the market and was informed that the price of wheat that day was $2.18 and that he would be allowed two cents extra for the protein content. We quote from his testimony:

"Q. And what discussion did you have with him relative to the wheat on that day? A. Well, he asked me what the protein test was and I told him it was 14.8, I believe it was, and he went and looked at the card and he said 'that should be worth three cents over market, but I can't give you more than two cents over the market.' I said, 'It's marked on the board now $2.18, you mean you are giving me $2.20?' and he said, 'Well, yes' and I said, 'Well, I want to sell that because I want to get the bin empty for the new crop.'

"Q. What else was said? A. Well, there probably was some conversation there that I couldn't just word, but I asked him if he could take that wheat now, and he said 'Not just now' and I said, 'Well, I am not exactly in a hurry, only I want to haul it in before harvest.' Ahlgren answered, 'I want the wheat before harvest.' "

He testified further that he came to the elevator the next day and talked with Tompers, an employee, and inquired about when he could start hauling in his wheat and was informed there was no room as yet. Later in the season he talked with the manager Ahlgren and we quote further from his testimony:

"I asked Freddie if I could start to haul in my wheat.

"Q. What did he say? A. He said, 'Did you want that in a special bin?' and I said 'It didn't make any difference to me.' I said, 'You bought the wheat, it's your wheat, don't make any difference to me whether you put it in a special bin or not.' and he said, 'I wouldn't buy that wheat.'

"Q. He said what? A. 'I didn't buy that wheat.'

"Q. Was there any more conversation that day? A. Well, we talked a little there, not very much.

"Q. What more was said, if you remember any of it? A. Well, he did say something about that I wasn't specific enough.

"Q. He did say something about that? A. Yah."

He testified that he had three meetings thereafter with the board of directors of the elevator company and that the manager Ahlgren was present at these meetings. These meetings were held on the following dates: September 14, 1950, July 16, 1951 and May 20, 1952. Plaintiff's testimony was not clear as to what occurred at these meetings. At the first meeting he said he told the directors that "he should have the right to haul that wheat in" but, "well there was no answer to my request at all." Referring to the statement of the board he said, "I would say it was more or less ignoring the point."

He testified also that at the first meeting he had presented to the board a written complaint. This written complaint is entitled, "The Complaint to the Directors of the Parshall Farmers Union Co-operative Elevator Co.", and was introduced in evidence as defendants exhibit "A". This is a lengthy document covering approximately 5 pages of the transcript. In the opening of this complaint he states that he believes in our cooperative system and the cooperative elevator but still our cooperative elevator does not get one single bushel of my

1949 crop, excepting the screening of the seed cleaned there. He then goes on to explain the reason. He stated that he figured on giving this crop to the "Co-op", that is most of it, but he realized that the independent elevator was getting it all when he had only one bin left so he thought he would let the "Co-op" have that anyway and went into the "Co-op" and sold it. We quote from his complaint:

"But the market went down and the manager then claimed I did not sell it using the argument that I was not specific enough. Now I want to explain this deal. I see nothing wrong or vague on my part. The manager had previously told if I got a certified protein test he would bid on it. We had procured that protein test (14.80) and now when I wanted to sell I asked how much he would give me for that protein wheat. He said 2¢ over market. The market was then marked on the board $2.18 and I asked him if he was giving me $2.20 and he said yes. I told him I wanted to sell it and I told him why I wanted to sell it so my selling was emphasized by the reason for selling. The reason given for selling was to get my bin empty for harvest. I told him how many bushels I figured there would be in the bin. We talked about when I could haul it in. He said he did not have much room just then. I said I was not exactly in a hurry to haul it in but I wanted it in before harvest. The manager answered he wanted it before harvest.

"I had said about all I could say in order to make a sale; I could not say any more, and if there was anything left to make that a deal it was the manager's part to co-operate and corroborate. The deal was specific enough from my part and if there was anything missing it was the co-operation and corroboration from the manager.

"It takes two to make a contract and a certain amount of co-operation between the two. If one party don't co-operate it is hard to make a contract.

I received spite work rather than co-operation at this elevator when I come in to sell, especially if the market is up and that is when I am in the elevator to sell. The manager seems to figure I should haul my grain in first and then sell it. I don't think I have done that for twenty years. I have my own storage facilities and I want to know what I am going to get for the grain before I haul it in.

"Why should I not be able to sell anytime I want to, anytime the market is up without having it in the elevator".

The complaint proceeds to refer to other and previous sales or attempted sales to the elevator company under the manager Ahlgren all of which he claimed proved unsatisfactory.

Edward Avery secretary and a director of the Farmers Co-operative Elevator Co. was called by the plaintiff for cross examination under the statute.

He stated that he was present at the first meeting had in September 1950 at which time Paul Broste was present and made his complaint. He read from the minutes:

"Paul Broste was present and presented a complaint to the Board of Directors as to the manager failing to contract his grain. Motion made by Roberts and seconded by Avery that all grain contracts be in writing and signed by the customer and manager. Motion carried."

He read next from the minutes of the second meeting held July 16, 1951, at which Paul Broste was present, as follows:

"Special meeting of the Board of Directors of the Parshall Farmers Union Co-operative Elevator was held in the elevator office on July 16, 1951 at 8:00 P.M. Members present were A. C. Torgerson, Albert Moerke, Axel Olson, Ernest Roberts, Waide Williamson, Ed Avery and Ed May."

"Motion was made and seconded that we pay no cash dividends this year. Motion carried. Paul Broste attended the meeting with a Complaint to the Board of Directors and after lengthy discussion with Mr. Broste the meeting adjourned."

He read further from the meeting of the Board of Directors held May 20, 1952 at which meeting the plaintiff Paul Broste was present.

"The meeting of the Board of Directors of the Parshall Farmers Union Co-operative Elevator was held in the office on May 20th, at 8:00 P.M. Members present were A. C. Torgerson, Waide Williamson, Ernest Roberts, George Rysen, Ed Avery and Ed May. The meeting was called to order by the President, A. C. Torgerson. Minutes of the last meeting read and approved as read. Paul Broste appeared in regard to wheat that he says to have contracted, that he stated that he lost twenty-four cents a bushel on 3,550 bushels. Motion made by Roberts and seconded by Hoffman that we continue to hedge grain as usual. Motion carried. Motion made by Roberts and seconded by May that we take out insurance of $3,000.00 on Joy Kline and Rodney Tompers. Meeting adjourned."

Mr. Ahlgren, the manager was present at the three meetings of the directors of the elevator company to which we have referred. At the meeting held on July 20, 1952 he told the plaintiff Paul Broste that he would pay him the sum of $852.00 in settlement of his claim. He testified as follows:

"Q. Now, at this third meeting, tell us what you said to Paul and what he said to you. A. Well, the discussion between Paul and the Board had gotten pretty deep and it was getting to the point where it was hard to understand just what Paul wanted. I know the Board questioned it if he—they asked him, I know members of the Board asked him, 'Is it money you want or do you want the manager canned or what do you want?' and so when I asked him, I said 'If I pay you this $852.00 out of my pocket, will you forget the whole thing and not say anymore about it?' he said he would. So then I told him I couldn't pay him in cash, but I told him I would pay him at the rate of $50.00 a month. He said he wouldn't take that, so I said he would have to give me a couple of days to raise the money.

"Q. And were you able to raise the money? A. Yes, I was.

"*     *     *     *     *     *

"Q. Now, then, after the meeting was over, then what did you do about this matter, if anything? Did you raise some money? A. Yes.

"Q. How much did you raise? A. I raised the $852.00."

The plaintiff prepared a form of release and presented it to Ahlgren, but Ahlgren refused to accept it. He then prepared his own release and with reference thereto he testified as follows:

"Q. And then where did you take it, if you took it anywhere? A. I took it back with me down to the elevator.

"Q. And did you see Paul later about it? A. Yes, he came in then— he came in the elevator then.

"Q. About when? A. Oh, quite soon after that, within a few days, anyhow.

"Q. And did you present that release to him? A. Yes, I presented the check and the release to him both at the same time.

"Q. You presented what? A. The check.

"Q. A check for what? A. For the $852.00.

"Q. Well, what happened at that time?

"Q. (By McIlraith) No, when Paul came in now, what did you do with

that form of release? A. The first time Paul came in, then I showed it to him.

"Q. Yes. A. That's right, and I had the check issued; that's right, and he looked at it and said that he couldn't sign it unless he had it checked by his attorney.

"Q. Couldn't sign it unless he had it checked by his attorney? A. Yes.

"Q. What happened the next time you and Paul met? A. Then he wouldn't sign it. He said he wanted me to sign his, or wanted me to take his release that he had.

"Q. Sign his release? A. No, he wanted me to take his release that he had signed.

"Q. And you wanted him to take yours? A. Yes.

"Q. Now, what was done after that, if anything? What was said between the two of you? A. When he found out that I wouldn't take his, why then I guess he got kind of mad at me and took off, and so I voided the check.

"Q. You what? A. I voided the check, and then he did come back later and said he would sign it if I crossed out a couple of those words.

"Q. And what did you say then? A. I refused to do it.

"Q. You refused to do it? A. Yes.

"Q. And has anything further occurred between you and Paul about this matter? A. No.

"Q. That's the way it stands today? A. (Nods in the affirmative)"

Mr. A. C. Torgerson was called by plaintiff Broste for cross examination under the statute on the theory that he was a director of the defendant Farmers Union Elevator Company. Defendants objected on the grounds that Torgerson was no longer a director and had not been a director since July 1952, which objection was sustained.

Torgerson was then called as a witness for the plaintiff. He testified that after the meeting of May 20, 1952 the plaintiff Broste came to Torgerson's farm and asked him to take a form of release to the defendant Ahlgren. The release was not signed by Broste at that time. After discussing it with Torgerson two or three words were stricken after which the release was signed by the plaintiff Broste. The next day Torgerson took the release with him to the elevator but he did not show it to Ahlgren. He asked Ahlgren why he had not paid Broste and Ahlgren said he would not pay Broste because he would not sign the release in the form it was originally drawn by Ahlgren and that thereafter he returned the release to the plaintiff Broste.

At the close of the testimony when both parties had rested counsel for defendants made a motion for a dismissal of the action upon the grounds that the plaintiff had wholly failed to establish any liability on the part of the defendants. The trial judge denied the motion, but stated that if the jury found a verdict for the plaintiff he would have to set it aside as to the defendants Farmers Union Co-operative Elevator Company. Counsel then moved for dismissal of the action against the elevator company which motion was granted. The question of the liability of the defendant Ahlgren was submitted to the jury and the jury returned a verdict for dismissal of the action. The plaintiff made a motion for judgment notwithstanding the verdict which was denied. The plaintiff appealed.

Plaintiff's specifications of error include:

1. Numerous exceptions to the rulings of the trial court on admission or exclusion of certain testimony.

2. The refusal of the trial court to allow cross-examination under the statute of the witness Torgerson.

3. Refusal of the trial court to give the following requested instructions to the jury.

"Members of the jury, you are charged that if you should find from the

evidence in this case that Mr. Ahlgren offered to pay Mr. Broste the sum of $852.00 for settlement of a disputed claim, and that this offer was at that time accepted by Mr. Broste, and that this settlement agreement was to be reduced to writing, but was in fact never reduced to writing; then, nevertheless, you should return a verdict in favor of the plaintiff and against the defendant, Mr. Ahlgren, for such amount as he orally promised to pay."

4. Error in dismissing the action against Farmers Union Cooperative Elevator Company.

5. The court erred in denying plaintiff's motion for judgment notwithstanding the verdict.

6. The court erred in denying plaintiff's motion for a directed verdict against the defendant Ahlgren, which motion was renewed and denied at the close of the defendant's testimony.

7. Error in permitting defendants' counsel to argue prejudicial matters to the jury picturing plaintiff as a malevolent and slanderous individual.

With reference to specification grouped under No. 1 above we have carefully reviewed the many objections made and exceptions taken by the plaintiff to the rulings of the trial court. When considered in their context and in the light of the entire record we are of the opinion that they are without merit. To review them in detail here would make this opinion unduly lengthy and would serve no good purpose. We are satisfied that the rulings of the trial court are correct.

██ The next specification for consideration is the refusal of the trial court to permit cross examination under the statute of the witness Torgerson. This witness was a director of the elevator company at the time of the alleged sale of wheat by the plaintiff to the defendants and he was president of the board of directors when the plaintiff appeared at the meetings held September 1950, July 1951 and May 1952,

but he ceased to be a director in July 1952. This action was tried in November 1953, more than a year after Torgerson ceased to be a director. This court has held that the right to cross examine a witness under the statute must be determined as of the time of the trial. Jacobson v. National Tea Co., 51 N.D. 889, 200 N.W. 910. We quote from paragraph 1, of the Syllabus:

"The right to cross-examine the managing agent of an adverse party at the trial, under sections 7863 and 7870 C.L. 1913 (now Section 31-0202 NDRC 1943), must be determined as of the time of the trial. The fact that the witness was such manager or managing agent at the time the negotiations were had, out of which the cause of action arose, is not controlling, and where the witness at the time of the trial has not been connected in any capacity with the defendant, as manager or otherwise, for a period of nearly two years prior thereto, it is error to permit such cross-examination over objection."

As to the refusal of the trial court to give the requested instruction we think the import thereof was covered in other portions of the court's charge to the jury. In its general instruction the court said:

"Where the terms of a proposed contract are fully understood and there is mutual assent thereof, a completed contract results though it is also agreed that the terms shall be reduced to writing and signed, unless it is expressly or impliedly stipulated that until the writing is executed the parties are not to be bound."

\*   \*   \*   \*   \*   \*

"If you should find by a fair preponderance of the evidence under these instructions that a contract or agreement of compromise and settlement of a disputed claim was entered into between the plaintiff and defendant Ahlgren, then the measure of damages would be the amount of money which the defendant agreed to pay in the undisputed sum of $852.00."

■ The proposition involved in the requested instructions was therefore substantially given in the quoted portions of the general instructions.

■ The next specification for our consideration is whether the trial court erred in dismissing the action as to Farmers Union Cooperative Elevator Co. The question presented is therefore whether there is sufficient evidence in the record from which the jury could find that the elevator company had in fact purchased plaintiff's grain as alleged in his complaint.

We have carefully examined the facts and circumstances disclosed by the record but we do not deem it necessary to set out the evidence in detail. We are satisfied that the evidence is not sufficient to present a question of fact for submission to the jury as to whether the Farmers Union Cooperative Elevator Company had agreed to buy from the plaintiff the grain involved in this action. There was no acknowledgment of any liability to the plaintiff by the directors at any of the meetings at which the plaintiff was present. The minutes of the meetings show that the plaintiff complained that the manager failed to contract his grain. The minutes further show that motions were carried at these meetings to "continue to hedge grain as usual and that all grain contracts be in writing and signed by the customer and manager". In the instant case no grain was hedged nor was there any contract in writing signed by the plaintiff and the manager. Upon the record it was not error on the part of the trial court to dismiss the action as against the elevator company.

With reference to plaintiff's claim against Ahlgren the testimony of the parties shows that Ahlgren personally offered to pay the plaintiff $852.00 if he, the plaintiff, would "forget the whole thing and not say anymore about it". The testimony further shows that Ahlgren told the plaintiff that there would have to be a release. Accordingly the plaintiff had one prepared by his attorney and presented it to Ahlgren. After showing the release to attorney Lerberg, Ahlgren refused to accept it. He then had a release prepared and submitted it to the plaintiff, and offered him a check in the sum of $852.00 upon receipt of the release signed by the plaintiff. Plaintiff refused to sign the release, but took it with him, and thereafter made some changes by striking out certain words therein. He then handed the release in its altered form to Mr. Torgerson, but Torgerson did not show it to Ahlgren. The check was voided by Ahlgren after the plaintiff refused to sign the release. This release was introduced in evidence as plaintiff's exhibit 1, and is as follows:

"In consideration of the payment of Eight Hundred Fifty-two Dollars, I hereby release the Farmers Union Elevator Association of Parshall, North Dakota, and F. W. Ahlgren, manager, from any liability in connection with a future sale of grain purportedly contracted in the year 1950. I further agree to cease and desist from any further agitation, litigation, and publication of said matter.

"It is hereby understood by me that this payment is not an acknowledgment of liability on the part of the elevator or its manager but is made to stop any further controversy on the subject and for a release of possible liability in the matter."

The plaintiff did not attempt to hold Ahlgren to the oral offer of payment. Instead he prepared and submitted to Ahlgren a written and signed release. Ahlgren did not accept it and prepared his own release which was not acceptable to Broste. Clearly it was contemplated by both parties that a written release was to be executed by Broste before payment of the $852.00 was to be made by Ahlgren. Since they could not agree on the form of the written release there is a serious doubt whether a valid agreement between them was consummated and the trial court properly submitted that question to the jury under the following instructions.

"I charge you, however, that the issue to be determined by you from all of the evidence in this case and under these instructions is whether Defendant

Ahlgren agreed to pay the sum of $852.-00 as a release in full compromise and settlement of the disputed claim of the plaintiff. In this connection, I charge you that you may not consider whether a contract of sale or sale of grain was actually effected or accomplished, as that question was the question in dispute which was alleged to have been resolved by the alleged contract or agreement of settlement."

██ The jury returned a verdict for dismissal of the action. The plaintiff made a motion for judgment against Ahlgren notwithstanding the verdict which was denied by the trial court. We think that under the evidence the jury was warranted in rendering a verdict for dismissal of the action. The motion for judgment notwithstanding the verdict was therefore properly denied.

██ In specification No. 7, plaintiff contends that the argument of defendants' counsel to the jury was prejudicial and held plaintiff up as a malevolent and slanderous individual. However, the language alleged to have been used by counsel has not been pointed out or shown in the record. Where a party predicates error on an attorney's argument to the jury he must present a record affirmatively showing the objectionable language used. Erickson v. Wiper, 33 N.D. 193, 157 N.W. 592; Hurley v. Chicago Milwaukee & St. Paul Ry. Co. 48 N.D. 1251, 189 N.W. 322.

The foregoing disposes of the specifications of error assigned by the appellant. After a careful review of the entire record we conclude that the judgment should be affirmed, and it is so ordered.

BURKE, C. J., and MORRIS, GRIMSON and JOHNSON, JJ., concur.